UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| W. GARY OLSON,<br><br>    Plaintiff,<br><br>  v.<br><br>EDWINA S. UEHARA, *et al.*,<br><br>    Defendants. | Case No. C13-0782RSM<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment (Dkt. #47) and Plaintiff's Cross-Motion for Partial Summary Judgment. (Dkt. #64). Defendants seek summary dismissal of the claims made against University of Washington President Michael K. Young and University of Washington Director of Claims Shari Spung. Defendants also seek a ruling as to Plaintiff's status as an "at-will" employee, which would resolve Plaintiff's claims that he had a property interest and/or contractual right to the procedures applicable to University Faculty. Dkt. #47. Plaintiff seeks a ruling that he was a "hybrid" employee and therefore could only be terminated for just cause, which also created property and liberty interests in his employment. Dkts. #64 and #70. For the reasons set forth below, the Court GRANTS Defendants' motion for partial summary judgment and DENIES Plaintiff's cross-motion for partial summary judgment.

ORDER
PAGE - 1

## II.    BACKGROUND

This lawsuit arises out of the separation of employment of Dr. Olson from the University of Washington.  Dr. Olson was employed as an administrator in the School of Social Work at the University of Washington for 27 years until his separation from employment in July 2011. Dkt. #22 at ¶ 14 and Dkt. #61 at 5.  From 1997 until his termination he worked at the School of Social Work at the Seattle campus in various capacities, most recently as the Assistant Dean for Student Affairs. Dkt. #22 at ¶ 14.  Dr. Olson alleges that he was also a Lecturer and member of the UW faculty during the autumn, winter, and spring quarters from 2008 through 2011.  *Id.*  Defendants assert that he was a part-time Lecturer only through the end of winter quarter in March 2011.  Dkt. #48 at ¶ 6 and Ex. A.

As Assistant Dean of Student Affairs, Dr. Olson had the ability and authority to register students to receive credit units.  Dkt. #22 at ¶ 14.  The parties acknowledge that graduate students enrolled in the School of Social Work must complete a certain number of credits to qualify for a graduate degree.  The parties also acknowledge that only credits from certain types of courses qualify to be counted toward the requirements for a graduate degree.  While "non-degree" credits do not count toward a student's degree, such credits do count for other purposes, such as receiving financial assistance.  *Id.* at ¶¶ 14-15.

Defendants allege, and Dr. Olson admits, that over a period of several years, Dr. Olson awarded "non-degree" credits to graduate students on a case-by-case basis, for which they were required to complete no actual work.  Dkt. #47 at 2 and Dkt. #22 at ¶¶ 26-29.  Dr. Olson asserts that he awarded these credits because these students already had intensive workloads and would be unable to receive the funding required to continue their studies if they did not receive the minimum number of credits needed to qualify for financial assistance. Dkt. #22 at ¶

¶ 26-29.  Dr. Olson also asserts that several UW graduate programs have a long-standing practice of awarding "non-degree" credits for field work by allowing the graduate student to register under a separate and unique course number issued by the university Registrar, and that no specific additional work or work product was expected in order to receive a passing grade that awarded credit.  Dkt. #22 at ¶ ¶ 26-29.

Dr. Olson claims that the vast majority of graduate students who required such assistance were minority and disabled students.  *Id.*  Dr. Olson used his "professional academic judgment" in determining whether the credit units the students were receiving accurately reflected the time they were devoting to the program.  *Id.*  After making this assessment, Dr. Olson would then determine if the students would be able to continue their studies without a small number of additional "non-degree" credits.  *Id.*  If they would not be able to continue their studies because they lacked the pre-requisite number of credits to qualify for financial aid, Dr. Olson would then allow them to register for the necessary number of units to qualify for aid, typically one to three "non-degree" credits.  *Id.*  Credits awarded under these circumstances appeared on students' academic records under the title "Soc W 599B."  *Id.*  Dr. Olson alleges that his awarding of such credits was known to Social Work administrators who would refer graduate students to Dr. Olson for that purpose.  *Id.*  Dr. Olson further alleges that his practice of awarding graduate students 599B credits was authorized by the University and was consistent and in compliance with all applicable policies of the University, the Graduate School, and the School of Social Work.  Dkt. #22 at ¶ 30.  Defendants deny the allegations. Dkt. #27 at ¶ ¶ 18-21.

In March of 2011, Dr. Olson desired to publicize on his personal blog the availability of 599B credits for graduate students who needed the credits to remain eligible for financial aid.

ORDER
PAGE - 3

Dkt. #22 at ¶ ¶ 33-36. He drafted an article about the 599B credits, and then emailed the Office of Financial Aid, to seek guidance on the content of the article. *Id.* at ¶ ¶ 34-38. Shortly thereafter, the Department of Audits began an audit of Dr. Olson's granting of non-degree credits. Dr. Olson asserts that he fully cooperated with the investigation. *Id.* at ¶ 40.

On or about June 1, 2011, Executive Director of the Department of Audits Richard Cordova issued a report documenting his findings and sent a copy to Dr. Olson's supervisor, Dr. Edwina Uehara. *Id.* at ¶ 51. The audit's primary finding was that Dr. Olson had "inappropriately" granted non-degree credits to students who "were not required to perform any work or to earn credit for the class." *Id.* at ¶ 54. The report also cited a number of sections of the University of Washington Policy Directory, which Dr. Olson had allegedly violated. *Id.* at ¶ ¶ 57-58. There is a dispute amongst the parties as to whether his awarding of 599B credits actually violated University policy. *See generally* Dkt. # 22 at ¶ ¶59-68, Dkt. #47 and Dkt. #61.

On July 11, 2011, Dr. Olson attended a meeting at the request of Dr. Uehara. Dkt. #22 at ¶ 80. Dr. Olson alleges that when he arrived to the meeting, several people were already in the room. *Id.* He further alleges that Dr. Uehara started the meeting by informing him that he was going to be terminated based on the results of the audit. *Id.* He alleges that she then gave him a choice – resign within 24 hours and he would continue to be paid for one month or he would be terminated immediately. *Id.* at ¶ ¶ 80-82. Dr. Olson resigned the next day. *Id.* at ¶ 83.

In February 2012, in response to a public records request, the University of Washington released the audit report. Dkt. # 22 at ¶ 87. Several articles were published in local news

ORDER
PAGE - 4

media as a result. *Id.* at ¶ ¶ 87-88. Dr. Olson alleges that he was never provided with notification of the records request or that the audit report would be released publicly. *Id.*

On July 2, 2012, Dr. Olson sent a letter to President Young requesting "a hearing to challenge the findings and management responses in the University's June 22, 2011 audit report that concerned [him]". Dkt. #49, Ex. A. President Young's Chief of Staff Jack Johnson responded by email July 6, 2012, acknowledging receipt of the letter and stating that the document Dr. Olson wished to challenge was a report, "not an administrative decision" entitled to a hearing. *Id.*, Ex. B. Mr. Johnson continued that the University did not provide a Presidential hearing process to appeal the report, and therefore his request was denied. *Id.* He further suggested that Dr. Olson provide the auditor with information that might change the auditor's conclusions, even though the report was a year old at that time. *Id.*

On February 15, 2013, Dr. Olson filed an administration Tort Claim with the University of Washington alleging numerous violations related to his separation of employment. Dkt. #50, Ex. B. On April 16, 2013, Director of Claim Services Shari Spung denied the claim, noting in her letter to Dr. Olson's attorney that "this was a voluntary resignation of Mr. Olson's at-will professional staff position, not a termination or forceful resignation as is characterized in the tort claim. Dkt. #50, Ex. A. The letter was also sent to several unidentified University of Washington employees, which Dr. Olson alleges was for the purpose of negatively influencing potential witnesses in this case. Dkt. #22 at ¶ ¶ 92-94 and Dkt. #34, Ex. D.

In the instant law suit, Dr. Olson alleges, *inter alia*, that President Young denied him his federal and state constitutional due process rights by refusing to provide him with a "name clearing" hearing. *See* Dkt. #22 at ¶ ¶ 163, 165, 223-248 and 309-315. Dr. Olson also alleges that the University deprived him of his liberty and property interests without affording him due

ORDER
PAGE - 5

process. *Id.* at ¶ ¶ 123-171. In addition, Dr. Olson asserts a defamation claim against Ms. Spung, alleging that the letter she sent containing the statement that he had voluntarily resigned was knowingly false and sent with malice in an effort to paint him in a bad light. Dkt.# 22 at ¶ ¶ 334-339.

### III.   DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

### B. Plaintiff's Employment Status

As an initial matter, the Court addresses the parties' arguments regarding Plaintiff's employment status, as this will inform its decision on Defendant's motion regarding the claims against President Young and Ms. Spung. Defendants argue that, in his role as Assistant Dean, Dr. Olson was considered to be a Professional Staff employee, rather than a faculty member. Dkt. #47 at 6. This is significant because Professional Staff employees are employed "at-will" and are not subject to the same policies and procedures as faculty members. *Id.* at 6-7. Plaintiff does not dispute that he was a professional staff employee during the time he served only as Assistant Dean. Dkt. #34 at ¶ 28. However, he asserts that during the time he was a Lecturer, he was considered to be a faculty member, and that there is a question of fact as to the period of time he was in that role. *Id.* at ¶ ¶ 28-29. Plaintiff further argues that the policy language applying to Professional Staff changes his status from "at-will" employee to a hybrid position in which he may only be terminated for cause. *Id.* and Dkt. #64. As a result, Plaintiff asserts that he had constitutional property and liberty interests in his employment, which afforded him certain due process protections. *Id.*

Because Plaintiff agrees that he was a professional staff member in his role as Assistant Dean, the Court first examines whether there is evidence to support Dr. Olson's contention that he was a Lecturer for the entirety of the 2010-2011 academic year, and therefore, a member of the faculty at the time he separated from employment. On July 29, 2010, Marcia Meyers, Associate Dean for Academic Affairs, sent a letter to Dr. Olson thanking him for his willingness to teach for the School of Social Work "during the academic year 2010-2011." Dkt. #48, Ex. A. While the letter also references that he had already been scheduled for a writing course during Winter quarter, nothing in the letter limits his appointment to that

timeframe. *Id.* Defendants rely on an entry in the payroll system to support their contention that his appointment was only for the Winter term. Dkt. #34 at ¶ 8 and Ex. B. While that entry certainly indicates Dr. Olson would only be paid as a part-time lecturer for the Winter quarter, it does not indicate that Dr. Olson was not appointed for the entire academic year. Indeed, no one asserts that Dr. Olson would not have been eligible to teach other classes that year, either in the Fall or Spring quarters had the need arisen. On this evidence, it appears to the Court that Dr. Olson was <u>appointed</u> as a Lecturer for the academic year, but <u>scheduled</u> to teach only one class during Winter quarter.

However, Dr. Olson, by his own admission, resigned in July 2011, <u>after</u> the end of his appointment in June 2011. *See* Dkt. #22 at ¶ 83 and Dkt. #34 at ¶ 29. Thus, the Court finds there is no question Dr. Olson served only in his role as Assistant Dean at the time he left employment with the University. As a result, the Court also agrees with Defendants that the Faculty Code did not apply to him at that time. *See* Dkt. #49, Ex. C.

The Court next turns to Plaintiff's contention that he was a "hybrid" employee at the time of his separation by virtue of language in the University's Administrative Policy Statement ("APS") 42.1, which is also set forth in the University's Professional Staff Program materials. Dkt. #64 and Dkt. #49. Plaintiff argues that the following language modified his employment status:

> Professional staff serve only at the will of the employing official. Professional staff do not serve a probationary period and do not attain permanent employment status. Professional staff appointments can be modified or ended for any reason that does not unlawfully discriminate against the employee or violate public policy. The term "violate public policy" means that terminations may not violate policies that the legislature and courts have established. Therefore, for example, an employee may not be terminated in response to or retaliation for such behavior as reporting allegations of employer wrong doing; refusing to commit an illegal act; or for performing a public duty or obligation, like jury duty.

ORDER
PAGE - 8

Dkt. #64 at 3-4 and Dkt. #49, Ex. D.  Plaintiff asserts that by stating "professional staff appointments can be modified or ended for any reason *that does not unlawfully discriminate against the employee or violate public policy*," the University has placed restrictions on the terminations of professional staff, thereby modifying the "at will" status of such employees, and creating a legitimate claim of entitlement in continued employment.  Dkt. #64 at 4-5 (emphasis added).  The Court is not persuaded.

The Ninth Circuit Court of Appeals has explained that legitimate claims of entitlement to employment arise when there are significant limitations on the discretion of the decision maker.  *See, e.g.*, *Braswell v. Shoreline Fire Dept.*, 622 F.3d 1099, 1102 (9th Cir. 2010).  However, the language upon which Dr. Olson relies is not such a limitation.  Relying on *Peterson v. Minidoka Cty. School Dist.*, 118 F.3d 1351 (9th Cir. 1997), Dr. Olson argues that the language above substantively restricts the grounds upon which he could be terminated.  However, Plaintiff misreads the holding in *Peterson*.  There, the Court of Appeals found that the policy at issue limited the grounds upon which a teacher could be nonrenewed, not because of the anti-discrimination language contained in the policy, but because it set forth "the only" criteria that could be considered for a nonrenewal.  *Peterson*, 118 F.3d at 1359.  Thus, *Peterson* is of no assistance to Plaintiff in this case.   Here, APS 42.1 merely reaffirms the intent of the University to maintain the "at-will" nature of Plaintiff's position, while recognizing that there are other protections for employees under state and federal law.  Likewise, Plaintiff's reliance on *F.D.I.C. v. Henderson*  is of no avail.  In that case, the Court of Appeals found there was no legitimate claim to a property interest in the plaintiff's employment because the restrictions he cited did not rise to a constitutional violation.  *See* 940 F.2d 465, 475 (9th Cir. 1991).

ORDER
PAGE - 9

Accordingly, the Court finds that, at the time of his employment separation, Plaintiff was an "at-will" employee with no legitimate interest in continued employment.

### C. Procedural Due Process Claims

Having determined that Plaintiff was an at-will employee at the time of his separation from employment, the Court now finds that his procedural due process claims should be dismissed. The requirements of procedural due process apply only to the "deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). When analyzing a procedural due process claim for deprivation of a protected property interest, the court must engage in a two-step analysis. *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 331 (9th Cir. 1995). First, the plaintiff must show that he has a protected property interest. Such an interest is a legitimate claim of entitlement to a benefit, which has to "be more than an abstract need or desire for it or a unilateral expectation of it." *Roth*, 408 U.S. at 577. Legitimate property interests are not created by the Constitution, but are created and defined by state laws, rule or understandings that give rise to an expectation of a benefit. *Id.* Second, after having demonstrated the requisite interest, a plaintiff must show that he did not receive all the process that was due. *Clements,* 69. F.3d at 331. The essential requirements of this pre-termination process are notice and an opportunity to respond to it. *Id.* Plaintiff fails to demonstrate that he has a property interest as a matter of law, as discussed above.

Further, under RCW 41.06.070(2), Dr. Olson's position was exempt from typical procedural protections given to public employees. RCW 41.06.070(2)(a) provides that the state civil service law shall not apply to certain University positions designated in the statute or established according to the statutory procedures. Plaintiff admits that the University does have

ORDER
PAGE - 10

explicit statutory authority to determine the terms and conditions of all UW employment pursuant to RCW 28B.20.200, which invests the board of regents with such powers.[1]

Moreover, in Washington, "at-will" employees have no property interest in their employment. *See Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993); *Curtis v. City of Redmond*, 2008 U.S. LEXIS 27271 (9th Cir. 2008) ("At-will employees have no property interest in their employment."); *Danielson v. City of Seattle*, 109 Wn.2d 788, 797, 742 P.2d 717 (1987). Because Dr. Olson's was purely an at-will employee at the time he separated from the University, he had no property interest in his continued employment. Accordingly, his claims are DISMISSED.

**D.  Section 1983 Allegations Against President Michael K. Young**

The Court now turns to Defendant's motion with respect to President Michael K. Young. Defendants seek dismissal of President Young on the basis that the substantive allegations set forth in Plaintiff's Second Amended Complaint fail to state a cognizable Fourteenth Amendment claim against him. They contend that Dr. Olson had no entitlement to any sort of hearing from President Young because he did not have a property interest entitling him to such procedural due process and because he was not a faculty member entitled to invoke the University of Washington Faculty Code at the time of his termination. Defendants further assert that Young is entitled to qualified immunity in any case. Dkt. # 47 at -13. Plaintiff asserts that President Young deprived him of his procedural due process rights under the U.S. Constitution by denying his request for a post-deprivation hearing following his termination.

---

[1] Plaintiff argues that Defendants raise this argument for the first time in their Reply brief and therefore the Court should not consider it. However, it appears that Defendants adequately raised this argument in its Motion, noting that his position was exempt from procedural protection afforded to Civil Service positions. Dkt. #47 at 6.

ORDER
PAGE - 11

Dkt. # 22 at ¶ 84. As noted above, Dr. Olson did not have such a right. Accordingly, his claim fails for that reason.

Additionally, Dr. Olson was not entitled to a hearing based on his status as a faculty member. While Plaintiff contends there is a disputed factual issue regarding whether the "Professional Staff Program Complaint Procedure" constitutes a University policy, there is nothing in the record to suggest that it does not legitimately apply to professional staff such as Dr. Olson. The University of Washington Faculty Code sets out procedures for adjudicative hearings for the resolution of disputes involving faculty members. *See* Dkt. #61, Ex. C. The Faculty Code permits eligible faculty to request hearings and appeals within the timelines set out in the code. *Id.* However, the Court has already determined that Plaintiff was not a faculty member at the time of his employment separation, and therefore was not governed by the Faculty Code. Because the Faculty Code did not apply at the time of his termination, Plaintiff fails to demonstrate that he was entitled to the protections of the Code. Therefore, President Young was under no duty to provide an adjudicative hearing to Dr. Olson pursuant to that Code.[2]

Similarly, Plaintiff could have availed himself of the Professional Staff Program procedures which set forth complaint processes in cases where an employee disagrees with a proposed disciplinary action. Dkt. #49, Ex. D. Indeed, professional staff may file written complaints with their supervisors within 15 business days of the "action or incident on which it is based." *Id.* The supervisor must schedule a time to review the complaint with the employee and allow the employee to explain reasons for the complaint, after which the supervisor must provide a "brief written decision concerning the complaint" within fifteen business days. *Id.*

---

[2] Further, even if Dr. Olson was entitled to the protections in the Code, he failed to pursue his administrative remedies within the applicable 90-day time limit. Dkt. #40, Ex. B at §28-32B.

ORDER
PAGE - 12

Employees who are unhappy with the supervisor's resolution may seek "review" by the appropriate vice president, dean, or equivalent administrative authority by submitting a written request for review within 15 business days. If a complainant fails to seek timely review, the supervisor's decision is deemed final. *Id.*

Dr. Olson's letter to President Young was sent 11 months after he was informed that he would be terminated based on the findings of the audit report, which was well after the allotted time available to request a review of that decision. As a result, Dr. Olson failed to take advantage of the procedures available to him, and cannot now maintain a claim against President Young for declining to provide a hearing after the deadline had passed.[3]

Lastly, Plaintiff has not alleged facts that would substantiate a deprivation of any liberty interest. A liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality, and procedural protections of due process apply if: (1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment. *Matthews v. Harney County*, 819 F.2d 889, 891-92 (9th Cir. 1987) (citing *Jones v. Los Angeles Community College Dist.*, 702 F.2d 203, 206 (9th Cir. 1983)). When a public employee's liberty interests are violated during the termination of his employment, he must be provided with a forum within which he may defend himself. *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Mustafa v. Clark County School Dist.,* 157 F.3d 1169, 1179 (9th Cir.1998). However, Plaintiff cannot support such a claim in this case because President Young had no role in the

---

[3] Dr. Olson argues that this procedure also did not apply to him because it only applied to "employees" and he was no longer an employee once he resigned. The Court does not find this argument persuasive, as he does not explain why he failed to institute the procedure upon notice of his potential termination prior to resigning. *See* Dkt. #61 at 10.

ORDER
PAGE - 13

audit and the administrative events that led to the termination.[4] *See* Dkt. #67. In fact, there was no personal contact between Plaintiff and President Young related to his termination.[5] *Id.* In fact, the only allegation made by Plaintiff that even relates to President Young is that Plaintiff sent a letter to his office asking for a hearing to dispute the findings of the audit report, issued nearly one year earlier, to which he received a denial from a staff member of the President's office. Dkt. #22 at ¶ 84. This is not enough to maintain a claim against President Young.[6]

### E. Defamation Allegations Against Director of Claims Shari Spung

Finally, the Court turns to Plaintiff's allegations against Ms. Spung. Plaintiff's allegations center on her April 16, 2013, letter addressed to Plaintiff's lawyer denying Dr. Olson's tort claim, in which she stated that Dr. Olson voluntarily resigned his staff position. *See* Dkt. #50, Ex. A. Plaintiff contends that Ms. Sprung's statement is defamatory and portrays him in a false light, and was sent with malicious intent to negatively influence potential witnesses in his case.

In order to prove defamation, a plaintiff must establish each of the following elements: (1) an unprivileged communication, (2) falsity, (3) fault, and (4) damages. *Commodore v. University Mechanical Contractors*, 120 Wn.2d 120, 133, 839 P.2d 314 (1992); *Mark v. Seattle*

---

[4] Section 1983 civil rights claims require the personal involvement of named individual defendants. *See Johnson v. Duffy*, 588 F.2d 740, 744 (9th Cir. 1978).

[5] The Court denies Plaintiff's request to strike the Declaration of President Young in support of Defendants' motion. Dkt. #70 at 7-8. While Plaintiff claims he had no opportunity to respond to the assertions made by President Young, he had such opportunity in his Reply in support of his own motion. Moreover, Plaintiff does not actually dispute that President Young had no personal involvement with Dr. Olson.

[6] The Court also denies Plaintiff's request for a stay under Rule 56(d) as Plaintiff has failed to identify what he believes he will obtain through discovery that would allow him to adequately respond to the Motion. Moreover, his alleged "newly discovered evidence" is not persuasive, as the document upon which he relies applies to academic faculty members, not professional staff members such as Dr. Olson. *See* Dkt. #70 at 8 and Appendix and Dkt. #72.

ORDER
PAGE - 14

*Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981).  When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a *prima facie* case on all four elements.  *LaMon v. Butler,* 112 Wash.2d 193, 197, 770 P.2d 1027 (1989).  The *prima facie* case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists.  *Id.* (*citing Herron v. Tribune Pub'g Co.*, 108 Wb.2d 162, 170 (1987)).

Plaintiff's claim against Ms. Spung fails as a matter of law.  Plaintiff admits that publication of the letter to his attorney does not give rise to any defamation claim.  Dkt. #61 at 18, fn. 7.  Thus, his claim is based solely on his allegations that Ms. Spung sent the letter to others within the University.[7]  This is supported by an email Dr. Olson purportedly received from an unnamed colleague wherein Ms. Spung references the letter to Dr. Olson's attorney as being attached to the email.  Dkt. #34, Ex. D.  Such communications are privileged under Washington law. Washington courts have consistently held that intra-corporate communications are not considered published for purposes of a defamation claim when the statements are made within the "limits of their employment."  *Doe v. Gonzaga Univ.*, 143 Wn. at 702, 24 P.3d 390 (citing *Prins v. Holland-North Am. Mortgage Co.*, 107 Wn. 206, 208, 181 P. 680 (1919)).  This is because the entity is essentially communicating with itself.  *See id.* at 701.  Thus, communications made only among corporate personnel as part of the ordinary course of employment are privileged and not "published" for purposes of defamation.  *See Doe v. Gonzaga University,* 99 Wn. App. 338, 348, 992 P.2d 545 (2000), *reversed on other grounds*, *Gonzaga University v. Doe*, 536 U.S. 273, 122 S. Ct. 2268 (2002); *Woody v. Stapp*, 146 Wn. App. 16, 21, 189 P.3d 807 (2008); *Prins v. Holland-North America Mortg. Co.*, 107

---

[7] Plaintiff produces no evidence that the letter was sent to others outside of the University, nor does he provide a basis for discovery on that issue as he has presented nothing to the Court suggesting that such action occurred.

ORDER
PAGE - 15

Wn. 206, 208, 181 P. 680, 680 (1919). This rule shields individual employees as well as the corporation itself. *See Doe*, 99 Wn. App. at 348 (noting that, "after all, the corporation can speak to itself only through the individuals who work for it.").

Plaintiff argues that any privilege enjoyed by Ms. Spung was abused because she made a knowingly false statement. The Court disagrees. It is true that the privilege is lost if the plaintiff can show by clear and convincing evidence that it was abused. *Bender v. City of Seattle*, 99 Wn.2d 582, 600-01, 664 P.2d 492 (1983). A plaintiff can establish abuse if he can show that the defendant:

> (1) knows the matter to be false or acts in reckless disregard as to its truth or falsity, (2) does not act for the purpose of protecting the interest that is the reason for the existence of the privilege, (3) knowingly publishes the matter to a person to whom its publication is not otherwise privileged, (4) does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given, or (5) publishes unprivileged as well as privileged matter.

*Moe v. Wise*, 97 Wn. App. 950, 963, 989 P.2d 1148 (1999) (citations omitted). However, to demonstrate abuse, the plaintiff must show actual malice by clear and convincing proof. *Momah v. Bharti*, 144 Wn. App. 731, 742, 182 P.3d 455 (2008); *see also Herron*, 112 Wn.2d at 768 ("The plaintiff responding to a motion for summary judgment in a defamation case must show that the jury could decide in his favor while applying the clear and convincing evidence standard; *Mark v. Seattle Times*, 96 Wn.2d 473, 487, 635 P.2d 1081 (1981) (holding that "a defamation plaintiff resisting a defense motion for summary judgment must establish a *prima facie* case by evidence of convincing clarity"). The actual malice standard is subjective and focuses on the declarant's belief in or attitude toward the truth of the statement at issue. *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 343, 760 P.2d 368 (1988). Proof of the statement's falsity alone *is not sufficient* to overcome the privilege. *Wood*, 107 Wn. App. at 570.

ORDER
PAGE - 16

Here, based on nothing more than pure speculation, Plaintiff alleges that the letter was improperly disseminated to others in the University community for the purpose of negatively influencing the future testimony of witnesses. *See* Dkt. 33. Ms. Spung disavows any hostility toward Plaintiff. Dkt. #50 at ¶ ¶ 6-7. Similarly, Ms. Spung truthfully conveyed in the letter that Dr. Olson had resigned, and has testified that she meant nothing malicious by omitting that he would have been terminated if he had not resigned. *Id.* That omission, in and of itself, does not create clear and convincing evidence that Ms. Spung acted with actual malice. Thus, Plaintiff fails to demonstrate abuse of the intra-corporate communication privilege. As a result, his claim against Ms. Spung fails.

## IV.   CONCLUSION

Having reviewed the parties' cross-motions for partial summary judgment, the responses in opposition thereto and replies in support thereof, along with the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendants' Motion for Partial Summary Judgment (Dkt. #47) is GRANTED.

(2) Plaintiff's Cross-Motion for Summary Judgment (Dkt. #64) is DENIED.

(3) Defendant Michael K. Young is DISMISSED as a defendant to this lawsuit with prejudice, and the CLERK shall terminate Mr. Young from these proceedings.

(4) Defendant Shari Spung is DISMISSED as a defendant to this lawsuit with prejudice, and the CLERK shall terminate Ms. Spung from these proceedings.

(5) To the extent Dr. Olson's claims assert violations of his Due Process rights based on alleged violations of his property or liberty interests, including Causes of Action iv., v., viii., ix., x., xiii., xv.c., and xv.f., those claims are DISMISSED.

(6) To the extent that Plaintiff's defamation claim, Cause of Action xvi., is based on the actions by Ms. Spung, such claim is DISMISSED.

DATED this 4th day of September 2014.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 18